UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-32352 |
| | ) | |
| CHARLES V. MILES, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Hon. Judge LaShonda A. Hunt |
| | ) | |
| FIRST AMERICAN BANK as successor-in-interest to SOUTHPORT BANK, | ) ) ) | |
| | ) | Adversary Case No. 20-00317 |
| Plaintiff, | ) ) | |
| v. | ) | Judge LaShonda A. Hunt |
| | ) | |
| CHARLES V. MILES | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**

Following trial in this matter on November 28 through November 30, 2022, Plaintiff, Cindy M. Johnson, not individually, but as Chapter 7 Trustee (the "*Trustee*"), hereby submits the following Proposed Findings of Facts:

**I.     FINDINGS OF FACT[1]**

    **A.     Procedural Background**

    1.     Charles Miles ("*Mr. Miles*" or the "*Debtor*") commenced this bankruptcy case by filing a voluntary Chapter 7 petition on November 13, 2019 (the "*Petition Date*") as bankruptcy case number 19-32352. [Bk. Dkt., ECF No. 1[2]]. This filing is the Debtor's second bankruptcy filing since the entry of the Judgment (defined below) entered against him in favor of First

---

[1] References to Plaintiff's trial exhibits are denoted by use of "PX." References to the Debtor's trial exhibits are denoted by use of "DX." References to the Companies' exhibits are denoted by use of "CX")

[2] References to the Bankruptcy Docket for this case are denoted by use of "Bk. Dkt."

American Bank, as successor in interest to Southport Bank ("*FAB*"). [Sec. B, ¶3, Miles Stip. Facts,[3] and Bk. No. 14-37833, ECF No. 1[4]]. He previously filed a voluntary petition in this Court on October 20, 2014 under Chapter 7 of the Bankruptcy Code, which was dismissed on October 13, 2015 without discharge a year later based on his failure to complete a form regarding personal financial management. [*Id;* Bk. No. 14-37833, ECF No. 43].

2.  On August 10, 2020, the Trustee commenced two separate adversary proceedings in the Debtor's current bankruptcy case, including a 727 action (adversary case number 20-00316). [727 Adv. Dkt. No. 1[5]] (the "*727 Action*"). The 727 Action sets forth three counts under which the Trustee asserts that the Debtor's discharge should be denied. [*Id.*] Specifically, in the 727 Action, the Trustee seeks denial of the Debtor's discharge pursuant to 11 U.S.C.§ 727(a)(2), (3) and 4. [*Id*; Sec. B, ¶3, Miles Stip. Facts].

3.  The second adversary proceeding is against the entities known as Amerbank n/k/a Dolare, LLC and Inventous, LLC (f/k/a Miles Technology Solutions, LLC), and is adversary case number 20-00386. [Comp. Adv. Dkt. No. 1[6]] (the "*Companies Action*"). The Companies Action sets forth 10 counts under which the Trustee asserts that the Debtor was either not paid or not adequately paid appropriate wages or other compensation for the Debtor services to the Companies. The Debtor provided services to Inventous as an independent contractor and its CEO, and to Amerbank as an independent contractor, its CEO and as a W-2 employee.

---

[3] References to the stipulated facts between the Plaintiff and the Debtor are denoted by use of "Miles Stip. Facts"

[4] This Court may take judicial notice of publicly filed documents. *See Opoka v. Immigration and Naturalization Service*, 94 F.3d 392, 394 (7th Cir. 1996) ("Determinations to be judicially noticed include proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue.") (*citations omitted*); *General Elec. Capital v. Lease Resolution*, 128 F.3d 1074, 1081 (7th Cir. 1997) ("The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records." (*citation and internal quotation marks omitted*)); *see also Anderson v. Simon*, 217 F.3d 472, 474-475 (7th Cir. 2000).

[5] References to the Trustee's adversary proceeding against the Debtor are denoted by use of "727 Adv. Dkt."

[6] References to the Trustee's adversary proceeding against the Companies are denoted by use of "Comp. Adv. Dkt."

### B. Factual Background

(a)     Debtor's background

4. The Debtor is well educated. [Tr. p. 369-370]. He graduated from Notre Dame with a bachelor's degree in business administration. [Tr. p. 367, lns. 8-22]. He also obtained a broker's license and went to a graduate school of banking where he attained a certification in banking. [Tr. pp. 367-368, lns. 21-6]. The Debtor would receive approximately $8 million from his father, Randy Miles ("Randy"), who realized a significant monetary payout when he navigated the sale of the bank he ran, the State Bank of the Lakes. [Tr. 368-369, lns. 7-15]. The Debtor used the funds he received from the Randy's sale of State Bank of the Lakes to start and manage several business interests, including his companies Exceed Properties, Inc. ("*Exceed Properties*") and Exceed Technologies, Inc. [Tr. 369-370, lns. 21-19].

5. Exceed Properties was a company the Debtor formed to purchase real estate in Illinois, Florida and Nevada from 2004 to August 2008. [Tr. p. 37, lns. 1-4]. The Debtor also formed and operated Exceed Technologies, a technology company that also ceased operations on around August 2008. [Tr. p. 371, lns. 18-19]. In March 2006, Southport Bank loaned money to Exceed Properties for liquidity and operations. [D. Ct. Dkt., ECF No. 1 at ¶7] [7]. In August 2008, the Debtor and his father entered into a commercial guaranty where the Debtor and his father absolutely and unconditionally guaranteed the Southport loan to Exceed Properties. [*Id*. at ¶8]. Exceed Properties defaulted on the Southport loan, which in turn resulted in Southport seeking and obtaining the multi-million judgment in Case No. 10-cv-8321 in the amount of $5,429,916.71 (the "*Judgment*") against the Debtor that precipitated this bankruptcy filing. [*Id*. at ¶¶8-12; D. Ct. Dkt., ECF No. 206; Tr. 370, lns. 21-25].

---

[7] References to the District Court action in Case No. 10-cv-8321 against the Debtor filed by Southport Bank are denoted by the use of "D. Ct. Dkt."

  (b)  <u>Noncompliance with Prebankruptcy Citation Proceedings</u>

  6.  One month after entry of the Judgment, on November 25, 2013, Southport commenced post-judgment proceedings and issued a citation to discover assets in an effort to collect on the Judgment. (D. Ct. Dkt., ECF No. 219). FAB eventually assumed the Judgment, recommenced post-judgment proceedings and issued a second Citation to Discover Assets on August 23 2018 in a renewed effort to collect on the Judgment. [PX 4; D. Ct. Dkt., ECF No. 548].[8]

  7.  During the post-judgment proceedings, and from the issuance of the initial citation, the Debtor and his counsel took obstructionist measures to frustrate the judgment creditor's collection efforts by, among things, failing to appear at his citation exam, refusing to produce requested documents, and otherwise acting with complete disregard of the process. [D. Ct. Dkt., ECF Nos. 245 and 289]. Throughout the nearly ten-year post-judgment collection proceedings, the District Court sanctioned the Debtor on multiple occasions for his conduct during the citation proceedings, conduct that has hindered FAB efforts in collecting on the Judgment. [D. Ct., ECF Nos. 289, 596, 614, 668 and 669].

  8.  The Debtor's evasive conduct continued outside of the District Court's purview as well. [PX 59; Tr. pp. 409-411, lns 18-5; pp. 449- 451, lns. 7-4]. Prior to the issuance of the second citation to discover assets, on or around February 27, 2018, an investigator visited the home of the Debtor's sister Audra Jentel (hereinafter "*Audra*") and mother Jane Miles ("*Jane*") at 6725 State Route 71 in Yorkville, Illinois, a fact that the Debtor acknowledged being made aware. [Tr. pp. 452-453, lns. 8-22].

  9.  Despite being aware that collection efforts had begun, on or around May 2, 2018, the Debtor, deleted "all prior personal and business emails, text messages, approximately 10,000

---

[8] On May 25, 2018, FAB filed a motion to re-open the case before this Court and continue post-judgment proceedings [D.Ct., ECF No. 501], which was granted on May 31, 2018 [D.Ct. Dkt., ECF 505].

contacts …" as explained in a "Deletion Explanation" in his Response to Request for Production of Documents Directed to Charles V. Miles. [PX 59; Tr. pp. 409-411, lns 18-5; pp. 449- 451, lns. 7-4]. Also on May 2, 2018, the Debtor sent an e-mail to Richard Ehrenreich, the General Counsel for Amerbank (defined below), to delete all of his business e-mails from his Charlie@amerbank.com account (and all e-mail aliases) in real time, including the directive to erase any back-ups. [PX 60; Tr. 412-413, lns. 14-16]. The Debtor admitted that he did indeed delete all of his e-mails. [Tr. pp. 450, lns. 9-25].

        (c)        <u>Ownership of Inventous LLC and Dolare LLC</u>

10. Inventous was purportedly in the business of developing software designed to automate foreign bank transfers to the United States. [316 Adv. Dkt., ECF 51]. Inventous LLC was formed on September 10, 2012 as Miles Technology Solutions LLC ("*MilesTS*" or "*Inventous*"). [PX 39]. MilesTS was formed by the Debtor. [Tr. 53, pp. lns. 5-25]. At the time of formation, the Debtor's father, Randy Miles, was sixty-five percent (65%) owner. [PX 39, Exhibit B]. The Debtor owned another thirty percent (30%) and his then-wife, AJ Patterson ("*AJ*") owned the remaining five percent (5%).[9] [PX 39, Exhibit B]. Also at that time, the Debtor was listed as the sole Manager of Inventous. [PX 39, Exhibit A]. On November 19 2012, Ownership of MilesTS was transferred to AJ. Two months later, a revised operating agreement was filed reflecting A.J. as the sole member and the manager. [PX 40].

11. On or about September 23, 2014, at the time the Debtor and AJ were going through divorce proceedings, MilesTS, along with three other entities, was transferred from AJ to Audra at the Debtor's direction for $300. [Tr. p. 93, lns. 3-6; PX 19]. The Debtor admitted his involvement with the communications and documentation between AJ and Audra regarding the

---

[9] The Debtor was married to AJ before and after the Judgment, from November 20, 2012 to November 23, 2015.

transfer. [Sec. B, ¶20, Miles Stip. Facts; Tr. 389-390, lns. 23-3]. When asked during his Rule 2004 exam about whether the Debtor presented the documents for AJ's and Audra's signature, he responded, "I believe I was involved in communications related to this transaction, yes." [Sec. B, ¶21, Miles Stip. Facts]. The Debtor actually facilitated the transfer, including sending the Asset Purchase Agreement to AJ to sign and to Audra to counter-sign. [PX 20]. He also directed Audra to coordinate with AJ and go to two different Chase branches so Audra could be added to the business accounts and AJ could be removed. [PX 20].

12. Following the transfer, in September 2014, the business name of Inventous was changed to Black Stone Security LLC. Several months later, in June 2015, the name changed again to Inventous LLC. [Sec. B, ¶22, Miles Stip. Facts]. And yet another revised operating agreement filed a couple months later listed Audra Jentel—Debtor's sister—as the sole member and the manager. [Sec. B, ¶27, Miles Stip. Facts].

13. The Debtor also formed another company, Amerbank, LLC n/k/a Dolare LLC ("*Amerbank*" and together with Inventous, the "*Companies,*" or the "*Entity Defendants*") on December 31, 2015. [PX 27]. Amerbank is purportedly in the business of assisting offshore businesses with facilitating wire transfers to banks in the United States. [Comp. Adv. Dkt., ECF No. 51] Amerbank's initial Operating Agreement indicates that it is member managed and that its sole Member is Inventous. [PX 27]. However, the Debtor, not Audra, executed the Amerbank Operating Agreement as Inventous' CEO. [*Id*; Tr. pp. 8-10]. After FAB re-opened the District Court case and re-commenced collection proceedings, Amerbank later revised its Operating Agreement on December 21, 2018, after the fact, to also include Audra's signature as the managing member of Inventous. [PX 4; D. Ct. Dkt., ECF No. 548].[10]

---

[10] On May 25, 2018, FAB filed a motion to re-open the case before this Court and continue post-judgment proceedings [D.Ct., ECF No. 501], which was granted on May 31, 2018 [D.Ct. Dkt., ECF 505].

14. Amerbank's website as of May 31, 2018 indicates that the Debtor was the Founder, CEO and Director of Amerbank, and that Randy was the Chairman.  [PX 21].  Amerbank's website, as of May 31, 2018, also did not mention Audra on its home page.  [*Id.*; Tr. p. 276, lns. 1-15].  Amerbank's name was later changed to Dolare, LLC in response to cease and desist orders issued by state regulators.  [Tr. p. 158, lns 1-9; pp. 158-159, lns. 16-25].

15. Despite the nominal ownership of Inventous and Amerbank reflecting Audra and Inventous as owners, respectively, the true owner and operator of the Companies at all relevant times was the Debtor.  [Tr. pp. 85, lns. 16-23].

(d)    Audra's Role with Inventous and Amerbank

16. Despite Audra's nominal ownership status, by her own admission, Audra has no expertise in the businesses of Inventous or Amerbank.  [See Tr. p. 103, lns. 11-17; Tr. p. 105, lns. 11-18].  Audra also admitted that she has no anti-money laundering or federal wire transactions knowledge or experience. [*Id.*].  Audra was also uncertain of the name of Amerbank's sole investor, and unsure of the exact dollar amount of the investment.  [Tr. p. 99-100, lns. 16-15].  Though Audra claims that she relied on her dad (Randy) as an advisor, this claim is not independently supported on by any writing, e-mail or other evidence showing his involvement with the businesses.  [Tr. p. 176, lns. 10-11].  Instead, it was the Debtor not Audra performed the day-to-day operations of the Companies.  [PX 24, p. 28, lns. 4-12].

17. Also, prior to FAB's efforts to collect on the Judgment, Audra was not mentioned anywhere in the Private Placement Memorandum that the Debtor used to solicit investors for the Amerbank Holdings Incorporated, an Amerbank-related company that was never formed.  [Tr. pp. 126-127, lns. 22-3; PX 26]. Audra was also never listed anywhere on Amerbank's website or any other marketing materials or investment documents.  [*Id*; Tr. p. 182, lns. 15-22; Tr. 525-526, lns.

24-3]. Audra was added to the website around October 2018, approximately two months after FAB began its collection efforts. [Tr. p. 181, lns. 15-25].

18. From 2015 to 2018, Audra did not receive a salary from Inventous. [Tr. 112-113, lns. 17-12]. Instead, from 2015 to 2018, the Debtor took more money out of the Companies' accounts than Audra, the nominal owner. [Tr. 574, lns. 2-24]. W [Tr. p. 323, lns. 14-20.]

    (e)    <u>Schedules and Sofas</u>

19. On the Petition Date, the Debtor signed and filed various required documents including his schedules (the "*Schedules*") and statement of financial affairs (the "*Sofas*") [Bk. Dkt. No. 1; PX 50, 51, and 52]. The Debtor's Schedules and Sofas contained several material misrepresentations and omissions. [*Id.*] The Debtor's filings failed to disclose the entirety of his 2018 income received from Inventous, LLC. [*Id.*]. In his Statement of Financial Affairs, the Debtor reported $18,846 in gross income for calendar year January 1, 2018 to December 31, 2018 with the source of income from operating a business and from wages. [PX52]. However, during the period spanning from January 2018 to May 2018, there were $27,800 in transfers from Inventous to Jane's Chase account via Zelle while the Debtor was abroad. [PX 1; DX67; lns. 11-6]. Per Amerbank's general ledger, the Debtor received $6,745 from June 2018 to October 2018.

20. The Debtor, in his signed Sofas, also failed to disclose the gift of a wedding ring to his Mom. [Tr. at 527-528, lns. 13-24; PX 50; Bk. Dkt. 1, Sofas, Part 5, number 13]. The Debtor directed Jane to transfer $3,400 to a jeweler in Curacao for a ring to be used for an engagement with his then-girlfriend, Nadia Castillo. [Tr. pp. 526-528, lns. 15- 4]. Both the Debtor and Jane admitted to the Debtor receiving $3,400 from Jane for the engagement ring [*Id*. Tr. p. 233, lns. 11-18].

21. The Debtor also did not disclose any claims of ownership interest or unpaid compensation in his bankruptcy schedules in the Companies that he operated and held the position

of CEO prior to filing. [PX 50 and PX52]. Despite being made aware of these omissions, the Debtor never amended his schedules or his statement of financial affairs. [See Bk. Dkt.]. Though the Debtor would amend his tax return to correct his income, he never provided the amended tax return to the Trustee. [Tr. pp. 584-585, lns. 23-16].

    (f)    <u>Section 341 Meeting</u>

22. At the meeting of creditors under section 341 of the Bankruptcy Code held on February 4, 2020 (collectively, with the continued meeting dates, the "*341 Meeting*"),[11] the Debtor affirmed the accuracy of all of his bankruptcy documents filed on the Petition Date, including the information contained in the Schedules and the Sofas. [PX 49 at pp. 59-61, lns. 9-22]. Based on the omissions in the Debtor's Schedules and Sofas, the Debtor's affirmation was another misrepresentation under oath. [*Id*.]. Also, at the 341 meeting, the Debtor testified that he did not believe he received any 1099 income in 2018. [Tr. P. 489-49, lns. 23-19]. Specifically, although he had been CEO for some time, the Debtor claimed not to have received any compensation from the Companies, and, instead, testified at his Section 341(a) meeting of creditors that his only source of income was from donating blood. [Sec. B, ¶3, Miles Stip. Facts; PX 52].

    (g)    <u>Debtor's Measures to Hide Assets</u>

23. The Debtor took affirmative measures to hide his income and shield his assets from the reach of creditors. [Tr. p. 53, lns. 11-14; p. 57-58, lns. 4-6; pp. 65-66, lns. 21-3; p. 69, lns. 8-11; p. 85, lns. 16-23]. The Debtor admitted that it would be "illogical" to put businesses and accounts in his name while he owes money to creditors. [Tr. 381-382, lns. 19-19]. The Debtor also systematically removed any reference to himself as the founder and CEO of the Companies' public facing sites once he became aware that collection efforts had begun. [Tr. pp. 181-182, lns.

---

[11] The 341 Meeting was either adjourned and continued several times [Bk. Dkt., ECF Nos. 23, 25, 31, 35, 46, and 47].

15-20; pp. 214- 215, lns. 7-1; pp. 274-276, lns. 17-14; p. 401, lns. 1-23]. In addition, in order to maintain his fraudulent scheme to hide his assets, the Debtor used his then wife, AJ. [Tr. p. 85, lns. 14-25]. AJ testified that ownership of the Entity Defendants was placed in her name for the clear purpose of keeping those companies from the reach of creditors. [*Id*.].

24. The Debtor also used the bank accounts belonging to other family members to hide income from creditors. [See e.g., Tr. pp. 50-51, lns. 24-18]. The Debtor also deposited checks received from Randy for cash and then ultimately placed those funds into AJ's account [*Id*.]. For example, Inventous made several payments to Jane's Chase bank account that was eventually used by the Debtor at a time where the Debtor chose not have any bank accounts in his name. [Tr. pp. 421-422, lns. 18-24; PX 1]. These payments were categorized as expenses to the Debtor for professional fees. [*Id*.; PX 2] At times, the Debtor also used both Randy and Jane's credit cards to pay for purchases. [Tr. pp. 68-69, lns. 12-5]. The Debtor admitted that he also using Jane and Audra's credit card at times for what he claims were business purposes. [Tr. p. 614, lns. 4-10; DX 66].

25. The Debtor used AJ, to pay for his expenses and personal purchases while they were married so that the money he received would go unnoticed. [Tr. p. 463, lns. 6-17]. The Debtor also used AJ to receive a gift from his grandmother of a 2004 Saturn Vue. [Tr. pp. 65-66, lns. 16-3; Tr. pp. 85-86, lns. 19-15]. The Debtor directed AJ to put the title under her name. [*Id*.]

26. The Debtor even used debit and credit cards from persons or entities that he could not identify to FAB's counsel. [PX 47, pages 86-89, lns. 6-5]. When asked during his citation exam about two receipts in his wallet for purchases he made using credit or debit cards, other than those already identified above, the Debtor claimed not to know the owners of those accounts from viewing the numbers on the receipts. [*Id*.].

  (h)  <u>Unpaid Compensation</u>

27. Although Debtor intended to be paid for his services to Amerbank, he never received any compensation from 2015 until May 2018. [Comp. Adv. Dkt., ECF No. 51]. The Debtor became employed by Dolare as CEO in May 2018 and received wages of $18,846 as a W-2 employee for 2018. [*Id.*]. Amerbank has always been owned by Inventous. [*Id.*] The Debtor worked for both entities, supporting certain duties for each company. It is unclear if or when Debtor ended his employment with Dolare. [*Id.*].

28. The Debtor served as CEO of Inventous since its formation in 2012. [Comp. Adv. Dkt., ECF No. 51]. The Debtor led business development activities for the company and the product development team for technology solutions built by Inventous. [*Id.*] From approximately 2014 through 2017, Debtor received annual compensation of $20,000 or less from Inventous as an independent contractor. In 2017, he was paid $27,106.99 as 1099 income. [*Id.*] The Debtor stopped formally working for Inventous in November 2018. [*Id.*] At no time did he receive a salary from the company. [*Id.*]

29. The Debtor served as CEO of Amerbank since its formation in 2015. Although Debtor intended to be paid for his services to Amerbank, he never received any compensation from 2015 until May 2018. Debtor became employed by Dolare as CEO in May 2018 and received wages of $18,846 as a W-2 employee for 2018. Amerbank n/k/a Dolare has always been owned by Inventous. Debtor worked for both entities, supporting certain duties for each company.

30. The Debtor spent considerable business develop time, and possibly more than 40 hours a week, working for the Companies. [Tr. pp. 89, lns. 9-13]. The Debtor also traveled internationally to find clients and investors for the Companies. [Tr. p. 513, lns. 12-3]. The Debtor's efforts would lead to Amerbank holding client funds in the millions of dollars and operating within the money services business. [PX36-38]. The Debtor was able to secure at least

one significant investor, Paxum Bank Limited ("*Paxum*"), for Amerbank.[12] [Tr. pp. 429-430, lns 6-23]. For the most part, the Debtor was not paid wages for services rendered as CEO or any commission for securing investors for the Companies. [Comp. Adv. Dkt., ECF No. 51]. However, when the Debtor began working and providing services to Amerbank, the Debtor intended to get paid compensation for his services. [PX 47, page 21, lns. 4-8].

        (i)        <u>The Debtor's Role While Abroad</u>

    31.    For a period of time, the Debtor moved to the Caribbean to live with his girlfriend. [Tr. pp. 453, lns. 16-18]. Though the Debtor contemplated resigning from Amerbank at some point in 2019, the Debtor would continue to provide substantial work for Amerbank to avoid "abandoning [his] family". [Tr. p. 453, lns. 5-10, lns. 11-18]. The Debtor consistently communicated with others, despite his family alleging that he was "off grid." The Debtor, using the application called WhatsApp [*See e.g.*, PX 61], extensively messaged several key members of Amerbank. [PX 61]. The chat board contained several substantive directives from Charlie, including conversations regarding account audits, securing Amerbank's loan investment, converting that investment into a loan, and acquiring needed software for the company]. [PX 61]. Even though Audra was also on WhatsApp, and allegedly "running her companies," the Debtor did not message her about anything business-related. [PX 61]. Further, there were no WhatsApp texts from Audra at all relative to any aspect of managing the companies. Nowhere in the WhatsApp chats does it evidence that Audra had anything other than a cursory role with managing the companies at all."

---

[12] In January 2018, Paxum wired a $250,000 investment to First Savannah Savings Bank ("FSSB"), where Amerbank held its bank account. [Tr. pp. 429-430, lns 6-23].

    (j)  $200,000 Transfer to Audra

  32.  In February 2018, the Debtor, not Audra, directed the transfer of $200,000 via wire transfer from Amerbank to Inventous, and then eventually to Audra for her benefit so that she could buy her personal residence. [PX 31; Tr. pp. 97-99, lns. 16-12; pp. 142 -144, lns. 20-8; pp. 433-434, lns. 7-17]. On February 20, 2018, at the Debtor's direction, Jane e-mailed First Savannah Savings Bank requesting a wire transfer for $200,000 from Amerbank's bank account to Inventous' bank account. [PX 29]. The Debtor requested this transfer to fund a purported loan to Audra. [*Id.*; Tr. pp. 433-434, lns. 7-17].

  33.  On February 26, 2018, $50,000 was wired to Audra from the Inventous account. [Tr. p. 150, lns. 21-24.] Two days later, on or about February 28, 2018, an additional $150,000 was transferred to Audra from the Inventous account. [Tr. pp. 150-151, lns. 18-1]. These transfers were funded by investor funds and completed without any formal approval. [Tr. pp. 98-99, lns. 2-19]. The documentation of these transfers was inconsistent. [PX 31; PX 32]. The Note dated February 26, 2018, references the Loan Agreement even though the purported Loan Agreement was not created until six and a half months later, on September 12, 2018. [PX 31; PX 32]. The Loan Agreement makes no reference to the Note. [*Id.*]. A loan analysis also shows the funds coming from Inventous, despite the fact that the Loan Agreement were solely with Amerbank. [Tr. pp. 434-435, lns. 12-21].

Dated: January 20, 2023  Respectfully submitted,

                                               */s/ Neal H. Levin*

                                               Neal H. Levin (No. 6203156)
                                               Jason J. Ben (No. 6281014)
                                               **Freeborn & Peters LLP**
                                               311 South Wacker Drive, Suite 3000
                                               Chicago, IL 60606
                                               (312) 360-6000 (office)

                                               *Counsel for First American Bank as successor-in-interest to Southport Bank*