**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br> Charles V. Miles,<br><br> Debtor. | Case No. 19bk32352<br><br>Chapter 7<br><br>Hon. LaShonda A. Hunt |
| Cindy M. Johnson, not individually, but as chapter 7 trustee,<br><br> Plaintiff,<br><br>v.<br><br>Charles V. Miles,<br><br> Defendant. | Adv. Pro. No. 20ap00316 |
| First American Bank,<br><br> Plaintiff,<br><br>v.<br><br>Charles V. Miles,<br><br> Defendant. | Adv. Pro. No. 20ap00317 |

**<u>MEMORANDUM OPINION</u>**

This matter is before the Court for ruling on two adversary complaints filed against

defendant Charles Miles ("Debtor") by Cindy Johnson, not individually, but as chapter 7 trustee

of Debtor's bankruptcy estate ("Trustee") and Debtor's main creditor, First American Bank

("FAB"), as successor in interest to Southport Bank, (collectively "Plaintiffs").[1] Plaintiffs object

---

[1] Plaintiffs filed separate adversary proceedings—*Trustee Johnson v. Miles,* No. 20ap00316 ("Tr. Dkt. No.") and *First Am. Bank v. Miles,* No. 20ap00317 ("FAB Dkt. No.") in connection with Debtor's chapter 7 bankruptcy case, *In re Miles*, 19bk32352 ("Bankr. Dkt. No.").  Because Plaintiffs shared counsel and relied on the

to Debtor's discharge under 11 U.S.C. § 727 for allegedly concealing his ownership of businesses, falsifying records, and underreporting his income, all in an effort to hinder creditors from collecting on their debts. Following a three-day trial, and upon consideration of the witness testimony and admitted evidence, as well as the post-trial submissions of the parties, the Court concludes that Plaintiffs have met their burden. Accordingly, Debtor will be denied a discharge.

## PROCEDURAL HISTORY

Debtor filed a chapter 7 bankruptcy petition in November 2019. Plaintiffs timely commenced these adversary proceedings nearly a year later with identical three-count complaints seeking to deny Debtor a discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(4). (Tr. Dkt. No. 1; FAB Dkt. No. 1). The parties proceeded with a combined trial on November 28-30, 2022, regarding these two complaints and a related complaint in which Trustee sought turnover of unpaid compensation allegedly owed to Debtor from Amerbank LLC n/k/a Dolare LLC and Miles Technology Solutions LLC n/k/a Inventous LLC, entities she believes Debtor owned and/or controlled (collectively, "the Companies").[2] (Tr. Dkt. No. 79; FAB Dkt. No. 55).

The following witnesses offered testimony at the trial: (1) Debtor; (2) Debtor's ex-wife, Amanda Jeane Patterson ("A.J."); (3) Debtor's sister, Audra Jentel ("Audra"); (4) Debtor's mother, Jane Miles ("Jane"); and (5) Richard Ehrenreich ("Ehrenreich"), who served as counsel to the Companies. At the close of evidence, the parties were granted leave to submit written

---

same evidence and arguments in these adversary proceedings, the Court is issuing one joint opinion that will resolve both complaints.

[2] *See Trustee Johnson v. Amerbank, et al.*, No. 20ap00386, Am. Final Pretrial Order, Dkt. No. 81 (Bankr. N.D. Ill. Oct. 20, 2022). The three proceedings involved the same witnesses and salient facts. In particular, Plaintiffs allege in the instant cases that Debtor's concealment of income received from and still due from the Companies warrants denial of discharge under sections 727(a)(2) and 727(a)(3). Notwithstanding that overlap in issues, because the turnover complaint involves different causes of action and parties, the Court is issuing a separate opinion resolving that matter.

proposed findings of fact and post-trial briefs in lieu of oral closing arguments. (Tr. Dkt. No. 91; FAB Dkt. No. 67).  This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052.

## **FINDINGS OF FACT**

The facts are derived from the pretrial stipulations, trial testimony, and admitted evidence.  The Court also takes judicial notice of the dockets in the relevant bankruptcy case and the adversary proceedings.  *See Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989).

## I.      **General Background and History**

Debtor comes from an entrepreneurial family with a background in the banking industry. (Tr. 1 at 186).[3]  His father Randolph Miles ("Randy") owned State Bank of the Lakes and served as President and Chairman of the Board for approximately 20 years.  (Tr. 1 at 187).  His mother Jane holds a bachelor's degree in music education but she later earned a paralegal certificate and worked for six years at a national law firm in the banking group dealing with bonds and securities.  (Tr. 2 at 238).  His sister Audra obtained a bachelor's degree in finance and sold insurance and mutual funds at Mass Mutual for four years.  (Tr. 1 at 101).  Debtor studied at the Air Force Academy and earned a bachelor's in business administration from the University of Notre Dame.  (Tr. 2 at 367).  He also obtained a broker's license and a certification from a graduate school of banking.  (Tr. 2 at 367-368).

Randy sold State Bank of the Lakes in 2005.  (Tr. 2 at 368).  Profits were used to establish a family foundation, and Debtor received about $8 million from the sale.  (Tr. 2 at 369). From 2004 to 2008, Debtor founded, owned, and operated a real estate venture financed by loans

---

[3]  The transcript references are to the trial held on November 28, 2022 ("Tr. 1"), November 29, 2022 ("Tr. 2"), and November 30, 2022 ("Tr. 3"), which were filed at Tr. Dkt. Nos. 92, 93, and 94, respectively.

from Southport Bank, FAB's predecessor, and investments from family, including over $900,000 from Audra.  (Tr. 2 at 370, 374-375).  When the market crashed in 2008, the venture failed; Audra lost her entire investment, and Southport Bank eventually obtained a $5.4 million judgment against Debtor sometime in late 2013.  (Tr. 2 at 374-375, 380).

In summer 2012, a year before entry of the judgment, Debtor and A.J. dated briefly before getting engaged.  (Tr. 2 at 376).  At the time, A.J. was employed as a senior data analyst for Jones Lang LaSalle ("JLL"), while Debtor was unemployed and surviving on contributions from family.  (Tr. 1 at 50).  Early in their relationship, Debtor told A.J. he had a $1.1 million judgment against him with another multi-million dollar pending judgment and explained that it did not make sense to put any assets in his name as they would be taken by creditors.  (Tr. 1 at 50; Tr. 2 at 379-380).  According to A.J., Debtor said that it would be wise to enter into a prenuptial agreement before getting married to keep their finances separate, which they did.  (Tr. 1 at 52).  A.J. and Debtor were married in November 2012.  (Tr. 2 at 376; Stip. at ¶ 8).

A.J. testified that Debtor's family members would deposit checks into her bank accounts because Debtor did not want trails of money leading directly to him.  (Tr. 1 at 51).  She recalled that in 2013, Debtor's grandmother gave him a vehicle, a Saturn Vue, which Debtor put in her name so that it could not be seized by his creditors.  (Tr. 1 at 65-66, 85).  On cross-examination, A.J. admitted that she drove the car on occasion.  (Tr. 1 at 84).

## II.      **Formation of the Companies**

In September 2012, two months before marrying A.J., Debtor formed Miles Technology Solutions LLC ("MTS"), an Indiana limited liability company that conducted "[a]ny lawful business, including the development of software technology."  (Pl. Ex. 39).  The operating

agreement dated September 10, 2012, identified Debtor as manager, with membership interests held by Randy (65%), Debtor (30%), and A.J. (5%). (*Id.*). All three members signed the agreement (A.J. was listed as Amanda J. Miles even though she and Debtor had not yet wed). (*Id.*) An amended operating agreement was filed on November 19, 2012, one day before Debtor and A.J. were married, specifying that "[t]he business of the Company shall be to develop software, web, and mobile security applications for government entities, financial institutions, telecommunication companies, retailers and consumers in the United States and Asia," and eliminating the shares of Debtor and Randy while increasing A.J.'s share to 100%. (Pl. Ex. 40). Once again, A.J. signed the operating agreement using her married name. (*Id.*)

At trial, Debtor testified that he did not recall the original operating agreement dated September 2012 that identified him and Randy as majority owners, as he had formed MTS to help A.J. bring her business ideas to life and intended it would be solely owned by her. (Tr. 2 at 381, 386). A.J. disagreed, stating that Debtor only put MTS in her name "[t]o protect his assets, or to protect any assets that he may create against anyone who might want to take his money." (Tr. 1 at 54). Debtor formed at least two other businesses, Goldfishbrain LLC ("GFB") and Krazy Otter LLC ("Krazy Otter"), and A.J. testified that she was listed as the owner of both at Debtor's request, because he anticipated that creditors would be after him. (Tr. 1 at 57).

After marrying Debtor in November 2012, A.J. left her job at JLL and began working full-time for MTS and GFB, alongside Debtor. (Tr. 1 at 57, 75). She worked long hours, did not recall being paid a salary from MTS, and believed most of the money earned was from GFB, a web and mobile design company. (Tr. 1 at 76, 91). A.J. testified that she invested tens of thousands of dollars into GFB, and most of her and Debtor's energy went towards that entity, although they would occasionally work on projects for MTS. (Tr. 1 at 90-91). A.J. did not think

there was much (if any) work for her to do for MTS because it held either a biometrics concept

or a patent that Debtor had developed with a friend from Notre Dame.  (Tr. 1 at 55).  Debtor

recalls differently and believes that MTS was building some other products but mostly providing

third-party services.  (Tr. 2 at 388-389).

In 2014, Debtor and A.J. separated, and in early 2015, she filed for divorce.  (Tr. 1 at

66, 72).  As part of their marital property settlement, on September 23, 2014, A.J. sold MTS,

GFB, and Krazy Otter to Audra for $300.  (Pl. Ex. 19).  At the time of the sale, A.J. described

MTS as "floundering," but GFB "had a lot of activity."  (Tr. 1 at 91).  A.J. negotiated the

purchase price for the businesses directly with Debtor, and said she accepted such a minimal

amount for all three companies even though she believed they were worth more because she was

"exhausted" and "desperate to be divorced."  (Tr. 1 at 79, 87).  Debtor helped facilitate the

transfer of businesses, instructing Audra and A.J. to go to different Chase Bank branches to

change over the signatories on the bank accounts.  (Pl. Ex. 20).

Audra testified that she purchased companies that were ready to go because it was a good

opportunity to buy them for little money.  (Tr. 1 at 107).  At that time, she was pregnant with

twins and her husband was seriously ill; he passed away not long after the purchase.  (Tr. 1 at

112).  Audra acknowledged that MTS did not have any assets and potentially had liabilities but

she thought there were about 4-6 people in place—web developers and tech people—to get the

company going.  (Tr. 1 at 107-108).  She could not recall the names of any of those individuals

or the specifics of any MTS projects.  (Tr. 1 at 109).  Audra had not been employed in financial

services since 2005, had no experience forming businesses or managing them other than a small

home-based clothing business, and had never solicited investments for a limited liability

company, for tech services or for development of digital services.  (Tr. 1 at 104-05).  She saw

this situation as family helping family with Dad Randy advising her, Mom Jane assisting with childcare, and Brother Debtor serving as CEO. (Tr. 1 at 113-14). She consulted regularly with Ehrenreich, legal counsel for the Companies. (Tr. 1 at 121). However, she did not keep any written documents or emails about business operations; instead, they all had discussions at home or on the phone and she made decisions that were needed. (Tr. 1 at 106, 223).

Soon after the sale transaction between A.J. and Audra, on October 2, 2014, MTS changed its name to Black Stone Security LLC ("BSS"). (Stip. at ¶ 22). Weeks later, on October 20, 2014, Debtor filed an individual chapter 7 bankruptcy, that was ultimately closed without discharge a year later when he failed to file a certificate of completion of a personal financial management course. (Stip. at ¶ 3). Debtor and A.J. signed their marital settlement agreement in February 2015, and their divorce was finalized in November 2015. (Tr. 1 at 61; Stip. at ¶ 8).

Not long after changing the name of MTS to BSS, the entity was renamed again on June 9, 2015, as Inventous LLC. (Stip. at ¶ 22). Debtor then formed another Indiana limited liability company, Amerbank LLC, in December 2015. (Tr. 2 at 396). Amerbank was organized as a member managed LLC with one member, Inventous, with a business purpose of "provid[ing] consulting services to financial institutions and related parties." (Pl. Ex. 27). Debtor signed the Amerbank operating agreement dated December 31, 2015, in his capacity as CEO of Inventous, even though Audra was the sole manager and member of Inventous. (*Id.*) (Tr. 2 at 400). Audra did not know what the responsibilities of a limited liability company manager were, and she believed that others could take actions for the company so long as she gave oral approval to do so and/or Ehrenreich alerted her about those actions. (Tr. 1 at 135).

According to Audra, Ehrenreich established Amerbank for her.  (Tr. 1 at 119).  She testified that she "relied on Rich to set that up and make those recommendations about how it should be set up, Rich being our—he was our in-house counsel."  (Tr. 1 at 119).  However, Ehrenreich stated that he was not involved in the formation of Amerbank, but he did review the operating agreement later.  (Tr. 2 at 302-03).  Ehrenreich admitted that the agreement did not provide authorization for the appointment of any offices such as CEO but stated it was not uncommon for companies to designate these titles for the benefit of third parties.  (Tr. 2 at 304-305).

### III.    Governance of the Companies

Audra described the executive/management ranks at Amerbank as consisting of herself, Debtor, Ehrenreich, Randy, Chief Financial Officer Stephen Coburn ("Coburn"), Senior Vice President Jason Price ("Price"), and Daniel Medina ("Medina"), who oversaw the AML (anti-money laundering) function that had to be kept separate under federal law.  (Tr. 1 at 176).  Amerbank was governed by a Board of Directors that served an advisory function, as Audra relied on their opinion but understood she was the ultimate authority.  (Tr. 1 at 193).  Another employee, Daniela Medarska, kept meeting minutes for regular, at least quarterly, Board meetings, and dispensed communications.  (Def. Co. Ex. 1).

Audra was aware that Amerbank was issuing a Private Placement Memo dated May 15, 2017, to give to potential investors, but she did not actively work on the document nor was her name listed anywhere in the business plan.  (Tr. 1 at 123).

From late 2017 through early 2018, Debtor was traveling overseas to develop relationships with potential clients.  (Tr. 3 at 561-62).  Audra believed that he had valuable expertise.  (Tr. 1 at 188).  Consequently, Audra decided in spring 2018 to pay Debtor a salary so

that he could receive insurance coverage. (Tr. 1 at 166). Audra testified that she and Debtor had previously discussed payment of compensation as the Companies' CEO, but he declined, citing all the money he owed her for the failed investments. (Tr. 1 at 203). Debtor admitted that he would have liked to be paid if the Companies were profitable, but he never demanded compensation. (Tr. 1 at 203).

Jane testified that she worked for Amerbank in 2017 and 2018 in a role where she coordinated with the bookkeeper about the finances. (Tr. 2 at 240). Although Debtor was not a signatory on the bank accounts, Jane would take occasional direction from him. (Tr. 2 at 242). Audra stated, however, that Jane would ask her permission before transferring money based on Debtor's requests. (Tr. 1 at 223). Audra authorized the transfers orally; nothing was ever written. (Tr. 1 at 224). Audra believes she put money into the Companies' bank accounts but could not remember when or how much and she had no written support. (Tr. 1 at 225). Jane could authorize the Companies' banks to move money into her personal account for Debtor to access. (Tr. 2 at 244). She claimed those funds were not compensation to Debtor but used for reimbursement of expenses while he was traveling. (Tr. 2 at 227).

Audra stated that Amerbank was doing well until summer 2018, when the states of Illinois and Virginia issued cease and desist letters that brought operations to a halt. (Tr. 1 at 220). After the cease and desist letters, Amerbank changed its name to Dolare LLC around August 2018. (Tr. 2 at 418).

## IV. Debtor's Role in Operating the Companies

Debtor retained his title of CEO of MTS after the operating agreement was amended in 2012 to make A.J. the sole owner. (Tr. 2 at 390). Debtor continued serving in that capacity after the 2014 sale to Audra and the 2015 name change to Inventous. (Tr. 2 at 400). Debtor, Audra,

9

and Jane testified that Audra controlled the Companies and made all necessary decisions in consultation with Randy, Ehrenreich, and Debtor.  (Tr. 1 at 106).  However, Audra could not produce a single document showing any communication she had with family members, or any employee or officer of Inventous or Amerbank n/k/a Dolare regarding any business decisions. Audra asserted that all of her decision making happened either in person or on the phone.  (Tr. 1 at 184, 195).  At trial, Plaintiffs introduced numerous emails, texts, and documents where Debtor controlled operations of the Companies.  (Pl. Ex. 13, 29, 30, 60, 61).  For example, Audra received a $200,000 loan from Inventous in February 2018. (Tr. 1 at 97).   Ehrenreich explained that Debtor secured Amerbank's only investment, $250,000 from Paxum Bank in the end of 2017 or the first week of 2018.  (Tr. 2 at 323, 430).  Debtor did not recall exactly how the investment was procured, but he believed Amerbank CFO Coburn may have also assisted.  (Tr. 2 at 430).  On February 20, 2018, Jane emailed the bank where the company accounts were held stating that Debtor "has asked me to request a wire transfer in the amount of $200,000 from Amerbank operations account to the Inventous, LLC account at Chase Bank."  (Tr. 2 at 264-65).

Jane claimed that it was Audra who instructed this transfer occur, but she mentioned Debtor in the email because the bank "didn't really know Audra, so [she] asked it from Charlie [who] [t]hey did know" even though Debtor purportedly did not have signing authority on the accounts.  (Tr. 2 at 265-66).  On February 26, 2018, $50,000 was wired to Audra from the Inventous account.  (Stip. at ¶ 33).  Two days later, an additional $150,000 was transferred to Audra again from the Inventous account.  (Stip. at ¶ 34).  Audra used the money to buy a house. (Tr. 2 at 439).

In March 2018, Coburn sent an email to Ehrenreich questioning why the transfer was made without Board approval.  (Pl. Ex. 22).  In January 2018, a month prior to the fund transfers,

Debtor had created and signed a mortgage pre-approval letter for Audra using Amerbank letterhead. (Pl. Ex. 30). Although Audra said she later repaid the loan to the Companies, no loan agreement or promissory note was created at the time the loan was made. (Tr. 1 at 98; Tr. 2 at 319). Instead, those documents were made months later in September 2018, and they contain a discrepancy, as the note dated February 26, 2018, references the promissory note which was not created until September 12, 2018. (Pl. Exs. 31-32).

The Amerbank website originally listed Debtor as founder, CEO, and director, and Randy as Chairman in May 2018. (Ex. 21). Debtor explained that he did not control the website content, but he could not recall if he communicated to the website developer that the term founder was incorrect. (Tr. 2 at 417-18). Audra was not listed on the company website at all at that time, as she initially did not want her name and image out in the public. (Tr. at 181, 276). She eventually changed her mind, and around October 2018, the website was updated to include Audra as owner. (Tr. 1 at 182). By then, FAB had reopened the citation exam and begun formal collection efforts. (Tr. 1 at 181).

Debtor used Jane's bank account to pay for his living expenses. (Stip. at ¶ 4). Jane would move money from the Inventous account to her account which Debtor accessed, sometimes at his request or other times whenever she saw the balance was low. (Tr. 2 at 242, 244, 270-271). Some of these expenses were denoted in Inventous's ledger as professional fees but others were simply marked as transfers to Jane. (Stip. at ¶ 5, Pl. Ex. 2).

On April 18, 2018, Debtor asked Jane to send $3,400 to a jeweler in Curacao to buy an engagement ring for Debtor's girlfriend Nadia Castillo ("Nadia"). (Stip. at ¶ 12; Pl. Ex. 13). Jane wired the money out of her personal account, which contained money from both Inventous

11

and Amerbank.  (Tr. 2 at 243-244).  Debtor returned the ring to Jane sometime in summer 2018, after his relationship with Nadia ended.  (Tr. 527-528).

Audra insisted that she is the legal owner of the Companies, the sole decisionmaker, and that her family was there only to help her.  (Tr. 1 at 193).  One example she cited was her choice to put Debtor on payroll in the spring of 2018 to get him health insurance.  (Tr. 1 at 166.)  Yet, Audra could not recall any written instruction she sent to the accountant to add Debtor.  (Tr. 1 at 224).  Curiously, Debtor instructed Ehrenreich in an email dated May 2, 2018, to "[p]lease add my sister and mother to payroll effective ASAP.  You can determine the numbers, titles and responsibilities with them."  (Pl. Ex. 60).  Jane stated that she started on payroll May 1, 2018.  (Tr. 2 at 283).  Audra testified that she received some compensation but not anything regular.  (Tr. 1 at 178).

Debtor travelled extensively at the end of 2017 and into 2018.  Jane, Audra, and Ehrenreich all testified to Debtor being difficult to reach during this period, as Debtor was abroad mainly in the Caribbean.  (Tr. 1 at 199; Tr. 2 at 282, 312).  Debtor stated this was a challenging time for him personally due to strife in his relationship with Nadia, and at times he did not have access to a phone because he had given his laptop and cell phone to Nadia to assuage her jealousy.  (Tr. 2 at 412-415).

On May 2, 2018, Debtor sent an email to Ehrenreich instructing him to have Debtor's assistant delete all his emails regarding the Companies, and to then read and delete all future emails in real time.  (Ex. 60).  Ehrenreich said he told Debtor he would comply, but he did not do so.  (Tr. 2 at 329).  Debtor later deleted all of his business emails, as well as all of his personal emails, Facebook, and LinkedIn connections.  (Tr. 3 at 531-532).  Debtor testified that he did this strictly due to the conflict in his relationship with Nadia.  (Tr. 3 at 532).  But he also admitted

12

that he knew an investigator sent by FAB had visited the home of Audra and Jane around February 27, 2018.  (Tr. 3 at 451-452).

Debtor used Jane's bank account instead of his own because he feared any assets in his name would be seized by his creditors.  (Stip. at ¶ 4).  Debtor eventually opened his own bank account in 2018, which was indeed frozen shortly after he opened it.  (Def. Ex. 68).

## V.   Debtor's Bankruptcy Filings

Debtor filed the instant bankruptcy case on November 13, 2019.  (Bankr. Dkt. 1.)  He signed the petition and statement of financial affairs ("SOFA") under penalty of perjury, and listed his total liabilities as over $14 million, including debts to FAB, Audra, Jane, and Randy, along with numerous others.  (*Id.*)  Debtor listed assets of less than $5,000, including a trailer for jet skis, golf clubs, two firearms, ordinary clothing and household goods, an investment account, and an unknown value for interest in the Randolph S. Miles Family Trust dated 5/5/94.  (*Id.*)  Debtor indicated he was not employed and his income of $380 per month came from donating plasma.  (*Id.*)  Furthermore, with respect to expenses, he included $0 for rent or home ownership and only $300 for food and $180 in transportation.  (*Id.*)

On the SOFA, Debtor listed only $18,846 as wages or commissions from 2018 and $27,106 from 2017.  (*Id.*)  When asked if in the last two years he had given any gifts to anyone worth more than $600, he marked no.  (*Id.*)  When asked if in the last two years he had transferred any property to anyone outside the ordinary course of business, he marked no.  (*Id.*)  When asked if he had owned a business or had any of the following connections to a business as a sole proprietor or self-employed, member of a limited liability company (LLC) or limited liability partnership (LLP), partner in a partnership, officer, director, or managing executive of a corporation, or owner of at least 5% of the voting or equity securities of a corporation, he marked

13

yes but did not indicate which option applied and listed only Dolare (misspelled as Dolora.)  (*Id.*)

Debtor testified that he had not "studied the document" in reference to the SOFA, but he did sign

it under penalty of perjury.  (Tr. 2 at 424).

When questioned by Plaintiffs in his Bankruptcy Rule 2004 examination about ownership

of the Companies, Debtor stated that it would be "illogical" to put assets in his name after 2008.

(Tr. 2 at 381-82).  Debtor concedes that he did not report on his SOFA the independent

contractor income of $27,800 from Dolare in 2018.  (Tr. 2 at 424).  He claims this was an

oversight and stated he recently amended his tax return to reflect the additional income.  (Tr. 2 at

424).

## JURISDICTION

The Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334.  This is a

core proceeding under 28 U.S.C. § 157(b)(2)(J).

## DISCUSSION

Discharge of debts in a chapter 7 bankruptcy case is a privilege reserved for the honest

but unfortunate debtor.  *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966 (7th Cir. 1999).

Nevertheless, the denial of a discharge is a harsh remedy; thus, objections to discharge are

construed strictly against creditors and liberally in favor of debtors.  *In re Juzwiak*, 89 F.3d 424,

427 (7th Cir. 1996).  Objecting plaintiffs bear the burden of proof by a preponderance of the

evidence.  *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

Plaintiffs argue that there is ample evidence in the record establishing multiple grounds to

deny Debtor a discharge, namely concealment of assets, destruction and falsification of records,

and failure to maintain documents and report all his income.  Debtor, on the other hand,

14

maintains that he disclosed all assets and acted in good faith.  Having heard the testimony and observed the various witnesses, the Court finds Debtor's explanations mostly unconvincing.

## I.  <u>Count I - Section 727(a)(2)</u>

Plaintiffs allege in their complaints that "Debtor is the owner of the Companies, in addition to the CEO," yet he "failed to disclosed his interest in the Companies while remaining the owner off paper."  (Tr. Dkt. No. 1, ¶ 169; FAB Dkt. No. 1, ¶ 170).  Plaintiffs point to Debtor's statements about it being "'illogical' to place entities under his own name because it would be subject to creditor take over" as evidence of this intent.  (Tr. Dkt. No. 1, ¶ 170; FAB Dkt. No. 1, ¶ 171).  They further allege that Debtor failed to disclose "his unpaid compensation for work as an independent contractor" for the Companies.  (Tr. Dkt. No. 1, ¶ 173; FAB Dkt. No. 1, ¶ 173).

Section 727(a)(2) provides that "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, or concealed . . . (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate."  11 U.S.C. § 727(a)(2).  Plaintiffs do not specify in their complaints if they are proceeding under subsection (A) or (B).  Generally speaking, the elements of both are substantially the same, even though section 727(a)(2)(A) "relates to a debtor's actions in the year prior to the petition date," while section 727(a)(2)(B) "addresses a debtor's actions *after* the filing of the petition."  *PNC Bank, N.A. v. Leongas (In re Leongas)*, 628 B.R. 71, 92 (Bankr. N.D. Ill. 2021) (emphasis in original) (citation omitted).  In their post-trial briefs, though, Plaintiffs argue that Debtor concealed both his ownership interest and income he should have received in connection with the Companies in violation of section 727(a)(2)(A).  Specifically, they assert that the evidence shows Debtor was operating the Companies in 2018

15

and 2019 and secretly receiving undisclosed income through the use of his mother Jane's bank accounts. Therefore, the Court will focus primarily on the one-year look-back period, while referencing events prior to that time to provide necessary context.

Plaintiffs must establish both an act and an improper intent to prevail on a section 727(a)(2) claim. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd, Kontrick v. Ryan*, 540 U.S. 443 (2004). The act, Plaintiffs contend, is the concealment of assets—the ownership interest and income—that has been continuous since the Companies were first formed back in 2012. *See e.g., Leongas*, 628 B.R. 71 at 92 (holding that a debtor's transfer of his interest in a house four years prior to filing for bankruptcy was a continuing concealment). And the intent, they contend, is evinced by Debtor's admissions that he wanted to keep assets out of his name as well as Audra's nominal ownership status of Companies that were clearly controlled by Debtor.

### A. The Act: Concealed Ownership Interest in the Companies

To succeed on their theory, Plaintiffs must first establish that Debtor held an ownership interest in the Companies that he would have been required to disclose. *See Leongas*, 628 B.R. 71 at 95-96. Plaintiffs contend that Debtor has always been the true owner of the Companies. In contrast, according to Debtor, Audra, and Jane, Audra owned the Companies while Debtor merely served as CEO of the family business. In sum, the Court finds the evidence insufficient to establish that Debtor owned a beneficial interest in the Companies from 2012-2016, but sufficient for the time period from 2017-2019.

It is undisputed that in September 2012 when Debtor first formed MTS, he initially held a minority membership interest. However, he amended the operating agreement two months later to make A.J. the sole member. While Debtor tried to play coy at trial when asked about the original agreement and continued to reaffirm his intent to give his new bride her own business,

16

his lack of candor is telling.  Debtor concedes that he formed MTS, and he has never stated that the identical signatures on the original and amended operating agreements are not his. Furthermore, having observed the demeanor of both A.J. and Debtor during their testimony, the Court found A.J.'s statement that Debtor told her he was facing sizeable judgments and wanted to avoid having any assets in his name for creditors to seize a more credible impetus behind the sudden change on the eve of their marriage.

That said, the fact that Debtor was an initial member of MTS in 2012 and subsequently "transferred" his interest to A.J. under questionable circumstances while remaining the CEO, does not necessarily demonstrate that he was concealing an ownership interest.  A.J. testified that both she and Debtor contributed significant time and money to MTS and other businesses on a full-time basis.  Plaintiffs focus solely on Debtor's motive to evade his creditors, which is relevant to the analysis.  But the existence and extent of property rights is determined by state law. *Butner v. United States*, 440 U.S. 48, 54 (1979).  Plaintiffs do not cite any case law to help the Court assess if Debtor's actions during that timeframe were consistent with indicia of ownership under Indiana law.  Merely working with his wife and other business partners for companies titled in his wife's name does not make Debtor the secret owner of those companies.

Plaintiffs emphasize the second "transfer" which occurred in 2014, when, as part of the divorce negotiations with Debtor, A.J. voluntarily agreed to sell all the businesses, including MTS, to Audra.  Debtor was involved in facilitating the deal, and A.J. stated that by then, he had creditors actively chasing him.  Southport, FAB's predecessor, had obtained a $5.4 million judgment against Debtor a year earlier in 2013.  And Debtor himself acknowledged he had no incentive to put or keep assets in his name in 2014 either.

Still, Audra also offered compelling testimony about her personal reasons for wanting to buy the businesses at that time.  Six years earlier, in 2008, she had lost nearly a million dollars through investments in Debtor's failed ventures, and now, she was facing life as a young widow with newborn twins.  The Court found credible her testimony about the desire to better secure her financial future through ownership of businesses run by and with the support of her entrepreneurial-minded family, even if MTS was struggling and she had no prior experience with its operations.  She believed there were other non-family employees, including Ehrenreich, their business counsel, who could assist her, and by all accounts, it appears that they as well as Debtor helped the business turn a profit for a few years.

It is true that Debtor had a hand in making this deal happen in 2014 between his then-estranged wife and sister, and his willingness to hand over valuable marital assets in which he had invested so much of his time and money was likely driven by self-serving motives.  But Plaintiffs have not shown that the 2014 sale between A.J. and Audra was merely a sham transaction to disguise Debtor's actual ownership interests in the businesses.  As such, the Court concludes that the evidence shows Audra was the legal owner of MTS in 2014, which was renamed Inventous in 2015, as well as Amerbank, the limited liability company formed by Debtor in December 2015 with Inventous as its sole member, which was renamed Dolare in August 2018.

Notwithstanding Audra's actual legal ownership of the Companies, the question for purposes of the section 727(a)(2)(A) analysis is whether Debtor possessed *any* ownership interest in the Companies as of November 2018, a year before he filed this bankruptcy petition.  As an initial matter, Debtor claims the Companies were defunct by 2018, as they had been shut down by regulators.  But Debtor's contention is belied by Plaintiffs' Exhibit 61, a voluminous

18

document produced by Debtor in discovery containing hundreds of pages of WhatsApp text messages that reflect him engaging in business discussions and transactions with employees of the Companies in 2018 and 2019.  Even though the Court expressed reluctance to admit into the record a large group exhibit where Plaintiffs referenced only a handful of pages during the trial, Debtor did not object to its admission.  Those facts in the record are fair game.

A concealment can still occur when there has been a "transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own."  *Matter of Kauffman*, 675 F.2d 127, 128 (7th Cir. 1981).  Thus, where the debtor transferred his house to his wife years earlier but continued to live there and pay the mortgage, taxes and insurance, the court upheld the finding that debtor "retained a beneficial interest in the property into the statutory period."  *Id.*

Plaintiffs do not cite a single case in their post-trial brief analyzing continued ownership of an allegedly transferred business interest.  They mention in passing that Audra was nothing more than a nominal owner of the Companies by 2018, but do not develop the argument, let alone explain how the theory applies under the law of the state where these entities were formed. According to Black's Dictionary, a nominee is a "party who holds bare legal title for the benefit of others."  (11th ed. 2019).  Based on the Court's quick review of Indiana case law, there does not appear to be a specific test for determining equitable ownership under a nominee theory.[4] Where state law is silent, the federal common law five-factor test would govern the issue.  *See*

---

[4] A number of Indiana cases address the concept of a nominee, but none seem to do so in the context of setting forth a test to determine if an ownership interest is record/legal versus equitable/beneficial.  *See Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012) (citing the Black's and Webster's dictionary definitions of "nominee" to determine that a mortgage was ambiguous for purposes of contract interpretation); *Young v. Gen. Acceptance Corp.*, 770 N.E.2d 298, 302 (Ind. 2002) (distinguishing between a proxy holder and beneficial owner, the latter of which retains ultimate control over the exercise of the voting power of the shares under the state share acquisition statute); *Jefferson Park Realty Corp. v. Ridgely*, 99 Ind. App. 146, 153 (1934) (distinguishing between individual equitable owner of common stock in company and record holder of the stock as trustee).

*United States v. Szaflarski*, 614 F. App'x 836, 838-39 (7th Cir. 2015).  The relevant factors to consider would be whether "(1) there is a close personal relationship between the nominee and the transferor; (2) the nominee paid little or no consideration for the property; (3) the parties placed the property in the name of the nominee in anticipation of collection activity; (4) the parties did not record the conveyance; and, (5) the transferor continues to exercise dominion and control over the property." *Id.*  Applying this test recently, the Seventh Circuit affirmed the lower courts' determinations that the trustee was entitled to turnover of the debtor's equitable ownership interest in a business entity.  *See generally Paloian v. Dordevic (In re Dordevic)*, 2023 WL 3113706 (7th Cir. Apr. 27, 2023).

There is evidence in the record of several of those factors here.  Debtor and Audra are siblings.  Debtor was concerned about collection activity in 2014 when he negotiated with A.J. to sell business interests that should have reverted to him as marital property to Audra instead.  Most importantly, at least from 2017 through 2019, the record reflects that Debtor was exerting a level of control over operations of the Companies that is consistent with his retention of some equitable ownership interest.  Indeed, although Audra testified repeatedly that she was the sole decisionmaker, neither she nor Debtor could produce a single written communication from Audra to substantiate this point.  For businesses that purportedly engaged in international monetary transactions with investors and had multiple employees in other countries, that is odd.  The Court does not doubt Audra's sincerity, but in listening to her testimony, it was clear that she was not familiar with the intricacies of the Companies she owned and claimed to be actively guiding through her decision making.

In contrast, the record is filled with evidence of Debtor's management and control of operations.  He was the face of the Companies on the webpage, in the proposed private offering,

20

with investors, and with employees in other countries.  There were certainly other non-family employees locally, such as CFO Coburn, but none of them testified at trial about how the Companies and the various employees functioned.   Quite candidly, it is still unclear to the Court exactly what role anyone other than Debtor played in managing day-to-day operations.  As already noted, the WhatsApp messages show Debtor conducting extensive business discussions with other international employees in 2018 and 2019, and no presence whatsoever by Audra.  She is not even included on most of the text messages.

In addition, Debtor's unfettered access to the Companies' finances in 2017 and 2018 is also evidence of dominion.  While Debtor, Jane, and Audra testified that Debtor did not have signing authority on the bank accounts, his fingerprints are all over multiple transactions.  He brought in the only investment of $250,000, which he then ensured Audra could use to obtain a $200,000 loan from her own business in February 2018.  Debtor's use of Amerbank letterhead to vouch for Audra in the mortgage process and Jane's decision to invoke Debtor's authority with the bank instead of Audra's to approve the fund transfer speak volumes.  Add to that Debtor's steady withdrawal of funds from the businesses throughout 2017 and 2018 that were routed through Jane's bank accounts, along with his direction to Ehrenreich in May 2018 to add Audra and Jane to the payroll and give them titles.  Taken together, all those circumstances are closer to elements of ownership than regular employee. *Cf. Harden v. Monroe Guar. Ins. Co.*, 626 N.E.2d 814, 820 (Ind. Ct. App. 1993) ("The three primary indicia of ownership of personal property are *title; possession; and control*, which includes the right to sell, dispose of, or transfer.") (citation omitted) (emphasis in original).

Debtor pushes back on the notion that he retained any ownership interest in the Companies, arguing instead that he was legitimately working gratuitously for family members.

21

That is a potentially valid defense; however, as detailed above, the facts do not support it for purposes of evaluating ownership.  And the cases Debtor relies upon in his post-trial brief are easily distinguishable.  Many "bankruptcy courts have determined that, despite an unqualified transfer of legal title, debtors who retain beneficial use of the property and treat it as their own continue to hold a beneficial interest that must be disclosed." *United States Trustee v. Garland* (*In re Garland)*, 417 B.R. 805, 816 (10th Cir. BAP 2009) (collecting cases).  In that underlying adversary proceeding, the bankruptcy court found that the debtor's continued check signing ability for a business, among other factors, was sufficient to establish control.  *United States v. Garland (In re Garland)*, 385 B.R. 280, 296 (Bankr. E.D. Okla. 2008).   Debtor urges the Court to find his lack of signing ability dispositive here.  Again, it is not.  As Debtor acknowledges in his post-trial brief, the focus of the analysis is whether a debtor maintains a spectrum of control over a business.  And the Court has already found that there are ample facts in the record to show that Debtor, like *Garland*, did so.

Debtor also points to a case where the debtor sold her business to her husband who was a creditor but debtor remained the manager.  *Smith v. Taylor* (*In re Taylor),* 424 B.R. 438 (Bankr. S.D. Ind. 2009).  The bankruptcy court found that she had not concealed a beneficial ownership because the transfer was done pursuant to an automatic turnover provision in the husband's promissory note with the business that kicked in upon default, and while the debtor handled the day-to-day duties, her husband, as the new owner, made the management and financial decisions. *Id.* at 441.  Unlike *Taylor*, this record contains little to no evidence that Debtor and Audra have maintained separate employer/employee roles in the Companies since she bought them.  Audra, Jane, Debtor, and Ehrenreich testified to that fact, but they offered no proof in support.

22

A more analogous situation to Debtor's can be found in cases where bankruptcy courts look at "if the debtor has transferred title under suspicious circumstances . . . such as after a debtor has suffered a money judgment or otherwise is under financial pressure, but nevertheless retains attributes of beneficial ownership." *Darwin (Huck) Spaulding Living Trust v. Carl (In re Carl)*, 517 B.R. 53, 65 (Bankr. N.D.N.Y. 2014) (citations omitted). The *Carl* court engaged in a multi-factor analysis under New York law before denying debtor's discharge based on his equitable ownership of a garage that was in his wife's name. *Id*. at 67. The debtor's wife had no prior experience with the business, and he worked there full-time and did not take a salary but instead had expenses paid for by his wife and the company. *Id.* at 66-67.

Similarly, where a debtor "had, with the intent to shield assets from the creditors, diverted the fruits of his labor to increase the value of his wife's businesses and then used business assets to support his personal lifestyle," the bankruptcy court finding of an active concealment was upheld. *Coady v. D.A.N. Joint Venture III* (*In re Coady*)*, 588 F.3d 1312, 1315 (11th Cir. 2009). There, debtor was the sole person actively involved in the wife's businesses, their success depended on his efforts, and his personal use of the business accounts, along with his wife's financial support, replaced his regular compensation. *Id.* at 1315-16. Consequently, the court held that "[t]hrough this arrangement, [debtor] acquired and concealed an equitable interest in his wife's businesses." *Id.* at 1316.

Likewise, this Court concludes that at least from 2017 forward, Plaintiffs have shown that Debtor engaged in similar tactics to conceal his ownership interest in the Companies.

**B. <u>Intent to Defraud with Ownership of the Companies</u>**

The determination of a debtor's intent is a question of fact*. In re Smiley*, 864 F.2d 562, 566 (7th Cir. 1989). The Seventh Circuit has held that the intent in § 727(a)(2) requires actual

23

fraudulent intent. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). Actual intent, rather than constructive intent, can be proven through circumstantial evidence. *Id.* One method of analyzing circumstantial evidence is to look at badges of fraud. There are six general badges of fraud recognized by the Seventh Circuit:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Vill. of San Jose*, 284 F.3d at 791 (citation omitted). Because fraud is difficult to prove, courts need to analyze circumstantial evidence. *Id.* Once the movant is able to show one or more of these factors, the burden shifts to the debtor to show a lack of fraudulent intent. *Id.*

Plaintiffs have met their burden of showing that Debtor had actual intent to hinder, delay, or defraud creditors. His admissions to A.J., Plaintiffs, and this Court about it being "illogical" to have any assets in his name, whether businesses or bank accounts, are difficult to overcome. The timing of these transfers just before entry of his main creditor's judgment in 2013, and while collections were being actively pursued from 2014 through 2019, only bolsters this finding. The general chronology alone of this case demonstrates the requisite circumstantial evidence that Debtor has failed to rebut. Debtor could have offered evidence from independent witnesses of the Companies, but he did not. His sister, his mother, and the family attorney all qualify as close family or close associate relationships that are more likely to be biased. Moreover, Debtor admitted that he had his living expenses paid for through Jane's bank account, and she, in turn, would move money from Inventous to her account to cover his personal expenses. This occurred while Debtor was acting on behalf of the Companies, making connections and representing the

24

business to third parties, and there is no written evidence showing that Audra made any substantive decisions or direction to Debtor.  Put another way, Debtor retained the benefits of ownership while intentionally concealing any beneficial interest that could be used to pay creditors for at least a year before the petition filed.  Therefore, Debtor violated section 727(a)(2)(A) and will be denied a discharge.

### C.  The Act: Concealment of Income

Plaintiffs also contend that Debtor violated section 727(a)(2)(A) by concealing both earned and unearned income.  They argue that Debtor concealed the income he received from the Companies through the use of his mother's bank account.  Debtor did not contest that his family has been supporting him financially for many years, or that since 2012, they routed money to him through his ex-wife's bank account or his mother's bank account for fear of his assets being seized by creditors.  But that is not enough to satisfy the high burden imposed for a finding under section 727(a)(2)(A).  Plaintiffs simply paint with too broad of a brush in assuming that *any* money given to Debtor from his family members for the last ten years or so constitutes concealed income.  Not so.  Plaintiffs bear the burden of proving both an act that violates the statute and intent.  They have not met those requirements.

The other nonstarter is Plaintiffs' argument that Debtor concealed income he should have received from the Companies for his work as an independent contractor.  Debtor claims his services were gratuitous, and even if that were not the case, he did not have an express or implied contract for compensation.  For the all the reasons more thoroughly discussed in the ruling in favor of the Companies in the related adversary for turnover of unpaid compensation, the Court agrees.  *See Johnson v. Amerbank, LLC, et al.,* Adv. Pro. No. 20ap00386, Memorandum

Opinion, Dkt. No. 102. Because Plaintiffs failed to show that Debtor was due any unearned income, their objection to Debtor's discharge on the ground of concealed income also fails.

Judgment will be entered in favor of Plaintiffs on Count I. Although that conclusion alone is enough to deny Debtor a discharge, the Court will consider the remaining grounds for Plaintiffs' objections.

## II.      Count II – Section 727(a)(3)

Plaintiffs allege in their complaints that, as a result of "Debtor's complete failure to include the Companies and income that he receives from his family members in his bankruptcy schedules," they and other creditors "are unable to adequately investigate his past business operations, reconstruct his financial transactions, or otherwise evaluate his financial condition." (Tr. Dkt. No. 1, ¶ 184; FAB Dkt. No. 1, ¶ 185).

Section 727(a)(3) provides that the debtor shall be denied a discharge if the debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The responsibility to keep and preserve financial records is heightened when the debtor is an educated and experienced businessperson. *See Leongas*, 628 B.R. at 103-06.

Plaintiffs argue in their post-trial briefs that Debtor should be denied a discharge under section 727(a)(3) for creating false records to conceal his ownership of the Companies and for deleting business emails. The first point can be quickly disposed of based on the Court's findings in section I, *supra*, that legally, the Companies were owned first by A.J. and then Audra. Plaintiffs offered no evidence here to show that the operating agreements drafted by Debtor

26

failed to satisfy corporate formalities under Indiana law.  As far as the Court can tell, those formation documents validly established them as sole members of the businesses.   Plaintiffs have not cited any legal authority suggesting the filings were defective or void, let alone false, simply because Debtor did not also disclose any retained interest he held in the Companies.

Plaintiffs offer a much stronger argument for denial of discharge for deleting business emails.  It is undisputed that Debtor emailed Ehrenreich, legal counsel for the Companies, around May 2, 2018, and asked Ehrenreich to have Debtor's assistant read and delete all of Debtor's emails in real time.  Ehrenreich testified at trial that while he responded to the email telling Debtor that he would take care of the request, he did not act upon it.  Debtor admits that he deleted all of his business emails concerning the Companies, as well as all personal emails, Facebook friends, and LinkedIn connections in 2018.  Plaintiffs assert that Debtor deleted his connections to the Companies in response to FAB having sent a private investigator to the homes of Debtor's family a few months earlier in February 2018.

Debtor argues the deletion was not an act done to conceal his financial condition, but rather a personal decision based on a troubled relationship with his fiancée, Nadia, with whom he was trying to avoid further conflict.  The Court is not persuaded by Debtor's explanation.  The timing of his request to the company lawyer is suspicious.  Furthermore, his excuse that Nadia was so insanely jealous that he had to delete all of his business emails is not believable.  Debtor was a CEO on an extended work trip in the Caribbean for the sole purpose of drumming up business for the Companies. He actively and regularly communicated with others via WhatsApp, but did not delete those text messages.  Debtor was well aware that in 2018, his primary judgment creditor was still on his trail, so to speak.  His response was to try to remove any connection between himself and the Companies in his emails to hinder those collection efforts.

27

That is the type of behavior section 727(a)(3) prohibits. *See, e.g.*, *In re Broholm*, 310 B.R. 864, 879 (Bankr. N.D. Ill. 2004) (holding that creditors "should receive sufficient information to enable them to trace a debtor's financial history, ascertain the debtor's financial condition, and reconstruct the debtor's financial transactions).

As an aside, Debtor suggests that Plaintiffs should not be able to rely on the deleted emails argument since it was not alleged in their respective complaints. Debtor is correct that the allegation was not specifically included nor did Plaintiffs ask for leave to amend their complaints. But this issue should not come as a surprise to Debtor. He disclosed his prior deletion of emails in response to requests for production in this case. Plaintiffs raised this as a ground for denial of discharge in their joint pre-trial statement and during opening statements at trial. Counsel for both Plaintiffs and Debtor questioned Debtor extensively at trial about the deleted emails. At no time did Debtor object to the evidence.

Technically, Plaintiffs could have made an oral motion to confirm the pleadings to the evidence presented at trial. Those requests are "addressed by Bankruptcy Rule 7015, which incorporates Rule 15 of the Federal Rules of Civil Procedure. Where the request to amend is brought during or after trial, and is not based on an objection at trial, then the applicable provision states that:

> [w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.

Fed. R. Civ. P. 15(b)(2). Debtor expressly consented to trying this issue by not objecting at the pretrial conference, during Plaintiffs' opening statement, or during witness testimony. Even if that were not the case, the claim was tried by implied consent. The standard set forth by the Seventh Circuit to determine if consent has been established is "whether the opposing party had

28

a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013) (citation omitted).  That standard is easily satisfied here.

Debtor destroyed emails that related directly to his business activities for the Companies. Because that information very likely included relevant details about his financial condition and business transactions Plaintiffs were entitled to investigate, and Debtor has failed to provide an adequate justification for the deletion, his discharge will be denied under section 727(a)(3).

## III.     Count III – Section 727(a)(4)

Plaintiffs allege in their complaints that "Debtor fraudulently underreported his 2018 income on his [SOFA]" with intent to deceive and mislead his creditors.  (Tr. Dkt. No. 1, ¶¶ 189-193; FAB Dkt. No. 1, ¶¶ 190-194).

Section 727(a)(4) provides that a debtor will be denied if the debtor "knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account … (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."  11 U.S.C. § 727(a)(4).  The purpose of § 727(a)(4) is to enforce a debtor's duty of disclosure to the bankruptcy court.  *In re Bostrom*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Stathopoulos v. Bostrom*, No. 02 C 9451, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003).

In order to prevail on a § 727(a)(4) claim a plaintiff must show five elements: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case."  *Stamat v. Neary*, 635 F.3d 974, 978 (7th

Cir. 2011). As with the other denial of discharge provisions, the plaintiff has the burden of proof to establish the elements by a preponderance of the evidence. *Grogan*, 498 U.S. at 287.

Although the complaints alleged that Debtor did not report all his income, in their post-trial briefs, Plaintiffs expanded this count to include a litany of other issues, including Debtor's alleged failure to disclose (1) the Saturn Vue from his grandmother as a gift on the SOFA; (2) $27,800 in independent contractor income for 2018 from Dolare in the bankruptcy petition or the SOFA; (3) his ownership of the Companies in the bankruptcy petition or the SOFA, or during the section 341 meeting of creditors; (4) receipt or transfer of the engagement ring Jane purchased for him to give to Nadia on the SOFA; and (5) income he accessed through his mother's account in the bankruptcy petition or on the SOFA. Debtor did not object at trial to the Court's consideration of any of these additional issues.

There is no question that each statement was given under oath because "[a] debtor's petition, schedules, statement of financial affairs, statements made at a section 341 meeting, testimony given at a Bankruptcy Rule 2004 examination, and answers to interrogatories all constitute statements under oath" for purposes of section 727(a)(4)(A). *John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 880 (Bankr. N.D. Ill. 2004). Whether they were false or even material depends somewhat on the assets. The Saturn Vue was gifted in 2013 and disposed of when Debtor and A.J. divorced in 2015. That is clearly outside the bounds of the 2-year lookback period of the SOFA. Similarly, once Debtor's relationship with Nadia ended, he returned the engagement ring to Jane who disposed of it as she saw fit. It would be a stretch to find Debtor was obligated to report that transaction. In addition, as the Court has already discussed, Plaintiffs did not meet their burden of establishing Debtor concealed income received through Jane's bank accounts.

30

Debtor concedes that he earned additional 1099 income in 2018 which should have been reported. Although he recently amended his income tax return to include that income, he has not yet amended his SOFA. Debtor testified that he inadvertently missed the independent contractor income because it was sent in a 1099 and not on a W-2, and he thought he had only W-2 income from that year. Plaintiffs must show that Debtor not only knew the statements were false but he made them with fraudulent intent. *Stamat*, 635 F.3d at 978. With respect to this income, the Court credits Debtor's explanation and finds that Plaintiffs did not establish the requisite intent.

Nevertheless, as the Court has already discussed, Debtor was obligated to disclose his interest in the Companies. On that ground alone, discharge will be denied under section 727(a)(4).

## CONCLUSION

For all those reasons, the Court finds in favor of Plaintiffs and against Defendant on Counts I, II, and III of the adversary complaints. As such, Debtor Charles Miles will be denied a discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(4). A separate judgement, consistent with this Memorandum Opinion, will be entered pursuant to Federal Rule of Bankruptcy 9021.

DATED: May 24, 2023                    ENTERED:

_____
Honorable LaShonda A. Hunt
United States Bankruptcy Judge

31